et al. Council on behalf of the appellant. Good morning, Your Honors, and may it please the Court. I'm Siobhan Murphy. I represent Mid-Century Insurance Company. With me at council table is my partner, Lisa Taylor, who handled matters in the case below. We're here today on an appeal from a remarkable decision that gave Founders Insurance Company a windfall that was contrary to the intent of the Berries. It's remarkable only in one sense, and I'm sure you were leading up to it, of the equitable contribution. But it might be remarkable as well in the sense that the Berries played very little role in the proceedings below. And what was the evidence below regarding what the Berries really wanted in February of 2005 regarding their business with Mid-Century? What did they really want? The Berries really wanted to move from being insured by Mid-Century with regard to the Cavalier policy in particular to being insured by Founders. What about, what business did they want to continue with with Mid-Century? At that time, they had a second vehicle, Durango, which they intended to continue with Mid-Century. So they wanted to continue business with Mid-Century, but not as to the Cavalier, but as to the Dodge Durango. Correct. And what's important about that fact is that this accident involved the Cavalier, which they intended. Was there any contrary evidence? Or did Mid-Century also acknowledge in the evidence below that in February 2005, the Berries did want coverage over their Dodge Durango with Mid-Century? Yes, I believe Mid-Century did acknowledge that that was the intent at that time. So what evidence is there that Mid-Century should be held to a policy that covers the Cavalier? Honestly, Your Honor, I don't think there is evidence in this record that supports that. Well, there is. It's the written policy itself, correct? That policy itself, in the absence of the other evidence, I would agree with you. But the other evidence indicates to us that that was the intent. How do you think that Mid-Policy was written that way? I think there was a mistake. And I think Mid-Century presented the fact that there was a mistake. Did you argue a mistake below? We did. Did you argue a reformation of the contract below? No, Your Honor. I don't believe reformation was or is the argument below or above. Well, let's say the accident happened with the Durango instead of the Cavalier. Would reformation be an issue then? No, Your Honor. Well, wouldn't the Berries be seeking coverage from Mid-Century over the Dodge Durango for an accident that happened when the reinstated policy was in effect? I think, Your Honor, I don't have the full record on the Durango policy, because it was not an issue. But I think that what would have... But what we do have is evidence that the Berries paid for a reinstated policy in February 2005, and Mid-Century issued a reinstatement policy in February of 2005. And the Berries received an insurance card covering the Dodge Durango in February of 2005. So what if the accident had happened with the Dodge Durango instead of the Cavalier? Would reformation be an issue then? I don't believe so. I think what would have happened then would have been Mid-Century would have insured its insured with regard to the risk that was intended to be insured, the Durango. And what was that? The Durango. Right. And how do you get there if you have a written policy that covers the Cavalier? If we issued the insurance card to the insured on the Durango and that was the intent, I don't think we'd be in litigation. I think there would have been a decision... You would have recognized that the written policy should have been written as the Dodge, covering the Dodge Durango, not the Cavalier. Correct. And then, and if you had denied it, that would make it a reformation. But if you accepted it, it wouldn't be a reformation. Right. And I don't, essentially, and I don't think there would have been litigation. This was a single policy, wasn't it? No, Your Honor. These are policies issued... It was two? Two policies? These are policies issued on different pages. And they are, in fact... Okay. So they were two separate policies? That's my understanding. Yes, Your Honor. But the 250 was going to cover both policies? I believe not. I believe each policy had its own limits and had its own terms. No, I mean the $250 check they set in. No. Was it for both policies? What happens there, Your Honor, was a simple misunderstanding. That was sent in for the purpose of buying coverage for the Durango. I thought they already had coverage for the Durango. Yes, but they had an ongoing premium that was... Issue. Issue. And so... To both policies or to one? I'm not sure I understand the question. Well, you just told me there were two policies and that they lapsed. As to each policy, the insureds would have to pay premium. The intent of the insureds here... That's right. You don't know if they ever sent that money back. That's one of the things you raised, isn't it? We understand it was sent back, but the record does not contain the check sending it back. That's right. Well, what we do know is that on February 7th or 6th, the Barrys entered into a policy with founders... Correct. ...to cover the Chevrolet Cavalier, and that left only the Dodge Durango to be covered by mid-century. That's correct. And the policy, there was a reinstatement policy issued by mid-century on February 10th, after the founders' policy was in effect. There was a reinstatement... And the question is whether that was covering the Dodge Durango or the Chevy Cavalier. The Barrys testified it should have been covering them. It should have been covering only the Durango. All right. But it covered both. It should have been covered only for the Durango. It covered both, but for the termination provision. Isn't that correct? When the reinstatement occurs, it relates back to the period when the policy was... Right. Except that there are only, there are two policies that issue. Mid-century issued two policies. Mid-century. One for the Durango, one for the Cavalier. They allowed the Cavalier policy to lapse, and unfortunately, the Durango policy also lapsed, and they sought to reinstate the Dodge Durango policy only. And they sought to continue with mid-century only as to the Dodge Durango. There were two policies. That's my understanding, yes. But the policy on the Cavalier was reinstated for the payment, was it not? That was a mistake, yes. All right. But either way, it reinstated the policy, and then it relates back to the date of the lapse, doesn't it? It's as if the coverage was always in place. It's as if the coverage accepted at the beginning. That's correct. It provides that if you secure other insurance, similar insurance, that this will automatically terminate. It provides that if you secure other insurance, any similar insurance on the policy will automatically terminate. That's correct. And so the policy was technically in effect before, because it related back. It was in effect, and therefore, when the accident occurred and there was similar insurance, that it's your position that it's termination. The laws terminated the mid-century as to the Cavalier. Had terminated it prior to the accident. The effective date of the other. Correct, on the effective date of the policy issued by founders, because it was the intent of both the Berries and of mid-century that this mid-century policy would not provide co-insurance when there was other insurance on the same vehicle. And that's the problem I have, because as Justice McBride has just clarified in the questions that she's asked of you, you're taking the position that the cancellation clause applies and was triggered, all of which assumes that the policy was correctly written for the Chevrolet Cavalier. And so that seems to be an odd position to take here when you also acknowledge that the evidence below was everything to indicate that Dodge Durango should have been covered and not the Chevrolet Cavalier, which is it? Our position is and was that there was a mistake here. And in terms of... Well, if there was a mistake, why does the cancellation clause anything to do with this case at all, if there was a mistake? I think you look at it, you can look at it as one of two ways. And I think this court brought a refreshing new perspective to it in asking us for the supplemental briefs. The way we looked at it below was that there was a meeting of the minds between the parties, that there would be no coverage for the Cavalier in the circumstance where there was other insurance procured to replace it. The way that the supplemental briefing caused us to really look at it is the question of whether there was a meeting of the minds that there would be coverage at all. And I think the truth is... Do we normally go out and look for the meeting of the minds when the actual document itself has a provision relating to an automatic termination? I'm not talking about substitution by termination. I'm talking about this policy that has an automatic termination provision. Do we normally go outside the corners of that document to look for the meeting of the minds? That's what the judge did in the trial court. Isn't that what the judge did in the trial court? Yes, it is, Your Honor. And the judge said that she could not find Mid-Century's intent when Mid-Century's intent is apparent on the face of the document. But in truth, in this particular case, if you do go outside the document, it's very clear that there was no intent for coverage to exist from Mid-Century in this particular case. Are we supposed to be going outside the document? I don't believe we are, Your Honor. I believe that the real analysis that should happen here is twofold. First, the court correctly asked, was there a meeting of the minds to reinstate? And on the evidence we submitted, below, there was not. It was a mistake on the part of Mid-Century. Would that, if you say that, and at the same time, would that mean that the Dodge Durango was never covered? And if that accident had happened with the Dodge Durango, then you would walk away because there was no meeting of the minds? No. Well, then what do you say? Your Honor, that the intent of Mid-Century would have been, and was, to secure insurance for the car that the Berries sought. So there was a meeting of the minds regarding an insurance policy. The question was, did that cover the Chevy Cavalier, or did it cover the Durango? There is no doubt that there was a meeting of the minds. I would agree with that. There is an agreement. Why don't you wrap it up? There is a second issue in our case that is equally dispositive, and that is the question of late notice. Well, the trial judge ruled that it was reasonable under the circumstances, and we'll address that in our decision. Well, I do, I would... You disagreed that it's not an abusive, we're not looking at this for an abusive discretion, it's de novo. These were summary judgments. Absolutely de novo. And on the late notice question, there are five factors that have been considered under Livorsi and Simmons before it, and for those five factors, clearly... Do we reach this point if we get to the mutual, or if we decide that the agreement was that it covered the Dodge Durango? Do we get to the reasonableness of the notice? If we are in agreement that the policy only covered the Dodge Durango, that ends this case. Why don't we leave it at that? If we are in agreement that the parties did not ever intend to cover this loss because of the procurement of substitute coverage, that ends this case. And if we're in agreement on late notice... We're not suggesting that we're in agreement at all, but we're saying that this positive issue is... You have two bases, too. I do. And I think the reasonableness issue is a significant one. I would ask to reserve a few moments when we come back. Thank you, Your Honor. So what about it? Good morning, Your Honor. Sherry Schell-Medine on behalf of Founders Insurance Company. I'm sorry, what's the name again? Sherry Schell-Medine. Your Honors, this was the first time in my career that the appellate court has ever asked me to supplement a brief. Your Honors, read the briefs, were concerned that there had been a waiver. Once I convinced myself that it wasn't my waiver, that it was instead mid-century's waiver, I could not help but conclude that there was a waiver. I was... Here's a more difficult question for you. Okay. If the question is, was it the intention, was it the mutual intention of mid-century and the Berries to cover the Dodge Durango? What's your role here? Your Honors, if it was the mutual intention of the parties and that was memorialized in their documentation, we wouldn't be here today. Because there wouldn't be a declarations page showing the Cavalier with an effective date of February 10th. We also have the insurance card issued by mid-century showing the Dodge Durango as the covered vehicle. So their underwriting documents are inherently inconsistent, except that they were signed and sworn to by an underwriting manager. My point is, what position do you think the Berries would be taking before, if they were here and had not signed that stipulation to accept the judgment, the declaratory judgment, basically removing them from the case? What position do you think they'd be taking here? Do you think they'd be taking the same position that they took below? That is, that when they paid that $250 premium, their intention was to reinstate the policy on the Dodge Durango? That was their testimony at their depositions. I have to assume that it would have been their testimony if they hadn't signed the stipulation. I believe that the Berries were relieved that the loss had been settled, and they just wanted to get on with their lives. I can't say that I blame them for that. I don't believe they really care one way or the other who's paying what. But the documentary evidence in this case does not support mid-century's argument before your honors. Also indicative of the waiver that occurred in the trial court is that in their pleading, mid-century nowhere pled mistake. Oops, we issued a declarations page in error. Sorry. They claimed it on orals. They did not plead that. What they pled was our automatic termination clause forgives us any obligation to cover this loss, and we have a breach of the notice provision. As your honor correctly pointed out, we don't even need to get to those arguments if there was never a policy in effect. The fact that they're arguing that the automatic termination provision applies, or the alternative that the notice provision applies, suggests that it is their position that there was a policy that reinstated effective February 10th. The timing of the reinstatement is what I believe troubled the trial court most. The founder's policy incepted on February 8th of 2005. The mid-century policy reinstated two days later. By operation of their automatic termination clause, their reinstatement would have been illusory because we had the if already in place at the time their reinstatement took effect. The reinstatement, doesn't the reinstatement go back to the period by law? No, your honor, the policy had, I think, canceled for nonpayment of premium. Right. There would have been a lapse. Doesn't, and when it's reinstated, doesn't that reinstatement relate back to the period when the lapse occurred? By operation of Illinois law. I always thought that it became effective as of the time the payment was received and the date on the declarations page. So that would have indicated that from the time that the payment was missed until the time a payment was received, there would have been a lapse. In this case, the reinstated policy was February 10th. The accident occurs on February 23rd. Right. So it was in effect at the time. Right. We have two policies in effect, but they cannot avail themselves of their automatic termination clause because our policy was in effect at the time their policy reinstated. Your policy predated. Right. So it would have been, it's the textbook definition of illusory coverage. Except. Except. What if the accident happened with the Dodge Durango? Would it have been illusory then? Well, we didn't insure the Dodge Durango, so they might be arguing. Right, so you might not be here. But they might be arguing against somebody else. It wouldn't be foundered. But I wanted to bring to this Court's attention a typographical error that occurred in our sequence of events. All right. Lisa Villarreal, who was the driver of the other vehicle, the Torpedo. She was a pedestrian, right? A pedestrian, I think. I think so. Yes, she was. Okay, a pedestrian. She filed her lawsuit on December 22nd of 2006. I had 2005. Okay. The Berries forwarded their suit to MidCentury in March of 2007. Months later. Just a few months later, though. I mean, it takes time to get service. And the judge said it was reasonable notice. Right. It was reasonable notice because they thought this whole time that they had stopped coverage on the Cavalier. But that didn't happen. We have the Berries saying we want to stop coverage on the Cavalier and MidCentury saying, oh, well, here's a deck page for that car. The documentary evidence is inconsistent. And, again, the issue of mistake was not raised in the trial court. It was not briefed before the trial court. I brought it up during the oral argument before Judge Novak wondering why it hadn't been made, because I would have been making that argument. But it wasn't, and it certainly cannot be raised for the first time on appeal. So as we stand here before your honors this morning, we have two policies in effect at the same time for the Cavalier. And the policy that the insurer is trying to avail itself of automatic termination reinstating two days after our policy, which just cannot happen. And the notice, again, I believe the trial court correctly found that there was a reasonable excuse for not notifying the insurer. I can't think of a better reason not to notify an insurance company. But the fact that they tendered these documents to MidCentury a few months after, you know, arguably they were served, tells me that there was still this uncertainty. You know what? Maybe MidCentury still did insure the Cavalier at the time of this accident. Let's tell them about this lawsuit. So it wasn't clear. I mean, in all of the cases, there are too many cases in Illinois dealing with automatic termination. We have other terminology like cancellation by substitution and things. But I bring this up for the simple fact. They aren't the same thing. No, they're not the same. But the courts also concentrate on the facts of each individual case very much. What's going on in the party's minds. What's going on on paper. And what's going on on paper in this case is that the policy reinstated two days after our policy took effect. Under these circumstances, Your Honors, we believe the trial court properly found that MidCentury simply could not avail itself of its automatic termination provision. And we respectfully ask that you affirm the ruling of the trial court. Thank you, Counsel. Thank you, Your Honors. A very short rebuttal. Thank you, Your Honor. I'll try to keep it very short. Very short. I believe that if the Berries were here today, they would say what they said in their depositions, that it was always their intent that the coverage they wanted to have from MidCentury at the time of this accident was for the Dodge Durango. And that that is why when they found out that there was a mistake with regard to coverage for the Cavalier, instead of sending notice right then and there of the accident they were well aware of, they requested cancellation. And I think that answers the question about the mutual intent in and of itself. And I also believe that we've provided to the court numerous sites to the argument on summary judgment where MidCentury did, in fact, say that it was MidCentury's argument that this was a mistake. And I don't think I need to belabor by quoting those. We've cited them in our brief, but they are there. So the argument that we didn't raise this afternoon. I concede that it isn't the issue that you raised before us. I think that it is the other side of the issue we raised before us. It isn't the express issues that you raised before us. I concede we phrased it very differently and conceived of it differently. But I do think we came within the same scope, and we're talking about the same facts. Depends on how broadly we read this. I understand. But I think we were talking about the same facts as dispositive that there was a mutual intent that there be no coverage here. And I thank your honors for the time. All right. The case will be taken under advisement.